IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 115-093 |
| | ) | |
| CECIL RAY HODGE, JR. | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendant, facing charges of marijuana distribution and related firearms charges, moves to suppress (1) evidence seized during a warrantless visit to his bedroom for the purpose of inspecting a parcel, on the basis that he did not consent to the officers entering his home; and (2) evidence officers located during a subsequent search of the home, after obtaining a search warrant based on the bedroom visit and parcel inspection. Upon consideration of the briefs and hearing conducted on December 16, 2015, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**. (Doc. no. 14).

**I. FACTS**

At the hearing, the Court heard testimony from Deputy Billy Jones and Investigator Joel Danko of the Richmond County Sheriff's Office. Defendant did not testify at the hearing, but instead relied upon the officers' testimony and a his own two-paragraph affidavit that states as follows: "1. On November 6, 2014, my home was searched by Richmond County narcotics officers. 2. At no point did I give the officers any permission to enter my home or to search therein." (Doc. no. 14-2, Aff. of Def.)

Deputy Jones testified that, on November 6, 2014 at 11:30 a.m., he received a tip

from an informant that a parcel box from California containing unspecified illegal narcotics would arrive that same day at Defendant's residence by United States Postal Service. (FTR 10:19:45 - 10:20:47.) Deputy Jones considered the information to be reliable because the informant had provided tips to Deputy Jones ten times in the past, and the information on every occasion was accurate and resulted in an arrest or seizure. (FTR 11:21:13 – 11:21:50.)

Deputy Jones and Investigator Danko, joined by Investigator Erik Williams and Sergeant Jason Vinson, set up surveillance at Defendant's residence in time to see a postal worker deliver a brown parcel box to Defendant's residence at approximately 1:45 p.m. (FTR 10:21:38 - 10:23:27.) According to Deputy Jones, when no one answered the front door, the postal worker left the parcel in the carport area. (FTR 10:23:27 - 10:23:52.) Just seven minutes later at 1:52 p.m., Defendant parked in the driveway, picked up the parcel, walked to the rear of the residence, and returned to the front yard holding a green plastic bucket. (FTR 10:24:15 - 10:24:42.) The officers approached Defendant in the front yard of the residence, and Deputy Jones asked Defendant what was inside the parcel. (FTR 10:24:42 - 10:26:01.)

Defendant acknowledged the parcel delivery, said it was not addressed to him, admitted that he had opened it anyway, and stated it contained "a weird green substance." (Id.) As Deputy Jones and Investigator Danko both testified, Deputy Jones responded by asking whether he and his colleagues could see the substance, and Defendant stated "sure." (FTR 10:26:01 - 10:26:10; 11:13:00 – 11:14:02.) According to both Deputy Jones and Investigator Danko, Defendant then motioned the officers into the home with a waving hand motion and also held the door open for them. (FTR 10:26:10 - 10:26:18; 11:14:01 –

2

11:14:20.)  The officers proceeded into the home.  (Id.)

Both Deputy Jones and Investigator Danko testified that Defendant led the officers down a hallway to the bedroom.  (FTR 10:26:18 - 10:26:24; 11:14:01 – 11:14:32.)  Once in the bedroom, Defendant stopped, turned around, and pointed to the parcel.  (FTR 11:14:32 – 11:14:41.)  Not once did Defendant tell the officers to stop, get back, or suggest that they stay put while he retrieved the parcel from his bedroom.  (FTR 11:24:55 – 11:25:19.)

On the bed, the officers observed in plain view two vacuum-sealed bags of marijuana and two scales.  (FTR 10:26:24 - 10:26:48; 11:14:41 – 11:15:25.)  After Deputy Jones mirandized Defendant and Investigator Danko arrested him, Defendant refused to grant permission for the officers to search the rest of the residence.  (FTR 10:27:23 - 10:28:28.) Investigator Williams left to obtain a search warrant while Deputy Jones waited in the driveway with Defendant.  (FTR 10:28:23 - 10:28:28; doc. no. 14-3.)  Investigator Williams returned with the search warrant at 3:40 p.m., and the team of officers conducted the search which led to confiscation of thirteen pounds of marijuana, 160 grams of methamphetamine, 108 grams of hashish, 173 morphine pills, and six firearms.  (Doc. no. 14-1).

Defendant signed a waiver of counsel form during the encounter, but the officers never presented him with a consent to search form.  (FTR 11:02:53 – 11:03:24; Ex. D-1.) Deputy Jones testified that he had consent to search forms in the vehicle but did not ask Defendant to sign one because (1) Defendant led them into the home and was cooperative; and (2) going to the vehicle to retrieve the form would have interrupted the flow of the interview with Defendant.  (FTR 11:06:38 – 11:07:21.)

Investigator Danko conceded that he normally asks suspects to sign a consent to search form before conducting a search, but he varied from this practice with Defendant

3

because the initial purpose was merely to inspect the package and not to search the home. (FTR 11:31:30 – 11:32:08.) The question posed to Defendant was thus whether he would show them the parcel and "weird green substance," not whether Defendant would consent to a search of his home. (Id.) Defendant responded by stating "sure," motioning them into the home, holding the front door open for them, and leading them down the hallway into his bedroom. (FTR 10:26:01 - 10:26:18; 11:14:01 – 11:14:20.) When defense counsel asked why the officers did not remain in the front yard while Defendant retrieved the package from the home, Investigator Danko replied "because he waved us in." (FTR 11:32:08 – 11:32:15.)

Deputy Jones was wearing a body camera during the encounter with Defendant but failed to record any footage. (FTR 10:33:07 – 10:33:48.) The body camera did not record the encounter even though Deputy Jones turned it on, and the likely cause was a technical glitch such as a low battery, a full video card, or a problem with the camera coming out of automatic sleep mode. (FTR 10:33:07 – 10:33:48.) Investigator Danko testified that the Richmond County Sheriff's Office had not yet issued body cameras to officers or provided training for their use, but instead was still conducting preliminary testing. (FTR 11:18:37 – 11:20:08.) Deputy Jones testified that Lieutenant Lewis Blanchard used his personal money to purchase cameras, including the one used by Deputy Jones, and Deputy Jones was using the camera on a trial basis. (FTR 10:32:16 – 10:32:57.)

Deputy Jones also testified regarding inconsistencies between his testimony and the facts as presented in the search warrant affidavit and narrative written by Investigator Erik Williams. (FTR 10:34:05 – 10:34:54; 10:47:55 - 10:48:52.) The affidavit and narrative stated that the postal worker left the parcel on the front porch while Deputy Jones testified

4

that it was left under the carport. (Id.; Doc. nos. 14-1, 14-4)  Deputy Jones testified that Defendant was in the yard when approached by the officers while the narrative and affidavit state that the officers knocked on the front door to speak with Defendant.  (FTR 10:34:05 – 10:34:54; doc. nos. 14-1, 14-4.)  The affidavit and narrative failed to mention Defendant's reference to "the sticky green substance" and Defendant waving the officers into the home to inspect the parcel. (FTR  10:47:55- 10:48:52; Doc. nos. 14-1, 14-4.)

## II.     HODGE CONSENTED TO THE PARCEL INSPECTION IN HIS BEDROOM.

Under the Fourth Amendment, a search conducted pursuant to a valid consent is constitutionally permissible.  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, the prosecutor bears the burden of proving that the consent was freely and voluntarily given.  Id.  Consent to a search is voluntary if it is the product of an essentially free and unconstrained choice. United States v. Boulette, 265 F. App'x 895, 898 (11th Cir. 2008).  "The standard for measuring the scope of . . . consent . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [individual giving the consent]?"  Florida v. Jimeno, 500 U.S. 248, 251 (1991).

Before discussing why the Court finds more credible the officers' testimony that Defendant gave consent, it is best to frame the discussion in the legal context of how courts make credibility determinations.  "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."  United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th

5

Cir. 2004) (recognizing that credibility determinations are within the province of the fact finder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also his or her intelligence, state of mind, candor, and demeanor on the stand. Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted); United States. v. Wein, No. CRIM. 05-317, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006). A reviewing court must accept the fact finder's credibility determination "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.'" Ramirez-Chilel, 289 F.3d at 749 (citation omitted).

After considering all facts and legal arguments, the Court finds the officers' testimony that Defendant consented to their entry into the home to inspect the package more credible than Defendant's vague affidavit testimony that he never consented to a search of his home. Deputy Jones and Investigator Danko testified in a manner that exuded intelligence and candor, and by their demeanor on the stand it was clear to the Court that they were prepared and careful in presenting the facts as accurately as possible. Just as importantly, both officers provided detailed accounts of their interactions with Defendant that were consistent on all material facts.

Their hearing testimony is also supported by the narrative and search warrant affidavit of Investigator Williams, except for immaterial inconsistencies or gaps. Defendant points out that Investigator Williams never mentioned Defendant's statement that he had received in the mail "a sticky green substance." Defendant also highlights inconsistencies concerning whether the parcel was left on the front porch or carport, and whether officers first encountered Defendant in the front yard or on the porch after knocking on the front door. It is neither surprising nor sufficient to cast doubt on the officers' testimony that minor

6

inconsistencies exist concerning such trivial facts. On the most important topics, there is a remarkable degree of consistency. Defendant also notes that the report and affidavit do not mention that Defendant waved the officers into his home to inspect the parcel. This is also not surprising since Defendant was not contending at the time that he refused consent.

Far less credible than the officers' testimony is Defendant's untested, vague testimony by affidavit that "1. On November 6, 2014, my home was searched by Richmond County narcotics officers. 2. At no point did I give the officers any permission to enter my home or to search therein." (Doc. no. 14-2, Aff. of Def.) The affidavit is bereft of detail, so much so that one cannot even discern with certainty whether Defendant is referencing the officers' entry into his bedroom to inspect the parcel, the subsequent search of his home, or both. It very well could be that Defendant is only referencing the subsequent search of his home, with respect to which the officers readily conceded they had to obtain a warrant because Defendant refused to consent. (FTR 10:27:23 – 10:28:28.) Regardless, the cryptic and vague affidavit is no match for the detailed, consistent, and earnest testimony of the officers at the hearing on both direct and cross examination. Finally, the affidavit, executed on November 11, 2015, was made long after the police narrative and search warrant affidavit, (doc. nos. 14-1, 14-4), yet it fails to address the contentions in both of these documents that Defendant replied "sure" and led them to the bedroom when the officers requested to see the package.

Given the totality of Defendant's actions, a reasonable officer in the position of Deputy Jones and Investigator Danko would have understood the scope of consent to allow them to enter the home and go into the bedroom to inspect the parcel and "weird green substance." Confirmation can be found in two decisions from the Eleventh Circuit finding

7

implied consent from the defendant's conduct and body language. In Ramirez-Chilel, 289 F.3d at 752, the Court upheld the officers' initial entry into a home as consensual where the defendant, standing at the front door when asked by the officers if they could enter, did not answer verbally but physically yielded the right of way to the officers. 289 F.3d at 752. The Eleventh Circuit explained that the entry was legal because "[a]lthough the officers did not receive any explicit verbal consent . . . to enter, the officers did receive . . . implied consent to enter from [the defendant's] body language . . . ." Id.

In United States v. Chrispin, 181 F. App'x 935, 939 (11th Cir. 2006), the Eleventh Circuit found implied consent where the defendant said nothing when the officer asked to frisk him, but indicated consent through body language. As the Eleventh Circuit explained, "although Chrispin did not express his verbal assent to be searched, his body language—turning away from Officer Lorente and placing his hands on the police cruiser as if preparing to be searched—gave implied consent." Id. at 939.

Here, Defendant's conduct communicated consent more strongly and clearly than the defendants in Ramirez-Chilel and Chrispin. Unlike those defendants, Defendant provided unequivocal verbal consent by replying "sure" to the question of whether the officers could inspect the parcel. Not leaving any doubt as to consent, Defendant then immediately welcomed the officers into his home by waving them inside and opening the front door, then leading them down the hallway to the bedroom and pointing to the parcel on the bed.

Also of importance to the issue of implied consent is the Eleventh Circuit's decision in United States v. Gonzalez, 71 F.3d 819, 829 (11th Cir. 1996) *overruled on other grounds,* Arizona v. Gant, 556 U.S. 332 (2009). The officer in Gonzalez asked permission from the homeowner to search the home for evidence of criminal activity by her daughter's boyfriend.

Id. at 823. Ignoring this question, the homeowner expressed her desire to go inside her home and get a drink of water for herself. Id. The officer, without asking for permission, followed the homeowner into the kitchen of her home. Id. The government argued the homeowner's "failure to bar [the officer's] follow-on entry" served as "an adequate implied consent to that warrantless intrusion." Id. at 829. The Eleventh Circuit rejected this argument because "the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry." Id. at 830 (quoting United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir. 1990)). It is not the defendant's burden to prove "unequivocal and specific objection to a police entry," the court explained, but instead it is the government's burden to show "unequivocal and specific consent." Id.

Here, the government is not arguing that consent is implied through, for example, Defendant's failure to bar officers from his home as they stormed through his front door without bothering to ask for permission. Instead, as detailed supra, the officers asked for permission to inspect the parcel, Defendant consented to the inspection verbally, and Defendant gave unequivocal consent through his conduct for entry into the home and bedroom to conduct the inspection.

The final question is whether Defendant consented to the entry freely and voluntarily, or whether the officers coerced his consent through intimidation or claim of lawful authority. Gonzalez, 71 F.3d at 828. Defendant does not accuse the officers of any such tactics of coercion or intimidation, and none is apparent from Defendant's affidavit or the officers' testimony. Indeed, the record tells quite the opposite story of officers approaching the home in a casual manner, exhibiting no signs of aggression or intimidation, and politely explaining their concern about the parcel and desire to see it.

Defendant attempts to demonstrate lack of consent by pointing to the failure of Deputy Jones' camera and the officers' failure to present Defendant with a consent to search form before entering the home. The Fourth Amendment requires neither written consent nor video evidence to demonstrate consent to search. See United States v. Pineiro, 389 F.3d 1359, 1363 (11th Cir. 2004) amended, No. 03-14723, 2004 WL 3059008 (11th Cir. Nov. 15, 2004) (upholding consent search where defendant refused to sign a consent-to-search form, but verbally consented to the search); United States v. Griffin, No. 2:10-CR-016-RWS-SSC, 2010 WL 6815894, at *6 (N.D. Ga. Sept. 8, 2010) report and recommendation adopted, No. 2:10-CR-00016-RWS, 2011 WL 2518808 (N.D. Ga. June 24, 2011) (upholding consent as voluntary where video failed to capture audio portion where defendant gave consent). And, as Investigator Danko testified, the officers were not initially asking for permission to search the entire home, but instead merely to inspect the parcel. Further, Deputy Jones was simply using the body camera for a personal trial at the time, without any departmental mandate, and his failure to obtain a recording was unintentional and merely the result of him not yet having any formal training concerning use of the device.

Because Defendant freely and voluntarily invited the officers into his bedroom to inspect the parcel, where the officers observed marijuana in plain view, the search warrant was supported by probable cause to believe that Defendant's home contained illegal drugs. Therefore, the evidence was validly seized, and Defendant's motion to suppress should be denied.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED** (doc. no. 14).

SO REPORTED and RECOMMENDED **t**his 19th day of January, 2016, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA